[No. C041202. Third Dist. Feb. 19, 2003.]

SIERRA VISTA REGIONAL MEDICAL CENTER, Plaintiff and
Appellant, v.
DIANA M. BONTA´, as Director, etc., Defendant and Respondent.

**COUNSEL**

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Appellant.

Bill Lockyer, Attorney General, James M. Humes, Assistant Attorney General, Thomas R. Yanger and G. Mateo Muñoz, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**NICHOLSON, Acting P. J.**—Pursuant to an agreement, plaintiff hospital is reimbursed by the state for medical services it provides to beneficiaries of the Medi-Cal program. The agreement called for the state to reimburse plaintiff for providing inpatient care in its neonatal intensive care unit at a rate which was greater than the rate agreed upon for other services. The state determined plaintiff had wrongfully sought reimbursement for services which did not qualify as neonatal intensive care services. Plaintiff unsuccessfully challenged the state's decision administratively, then challenged the decision by means of a petition for writ of administrative mandate. The trial court denied the petition and entered judgment in favor of the state. We affirm the judgment.

### STATUTORY BACKGROUND

1. *Medi-Cal Provider Agreements*

Through the Medi-Cal program, the Legislature intended to provide health care to the aged and other persons who lacked sufficient income to meet the costs of health care. (Welf. & Inst. Code, § 14000.) In 1982, the Legislature established a system by which the State Department of Health Services (Department) could contract with individual hospitals for the provision and payment of health care services through the Medi-Cal program. (Welf. & Inst. Code, § 14081.)

During the times relevant here, this new system required the California Medical Assistance Commission (CMAC) to negotiate "selective provider agreements" with hospitals. These contracts would establish the rates, terms, and conditions under which the Department would reimburse hospitals for providing inpatient services to Medi-Cal beneficiaries. (Welf. & Inst. Code, §§ 14082, 14082.5.) The CMAC had the "maximum discretion and flexibility in order to select among various methods of arranging for the provision of health services while achieving significant cost savings." (Welf. & Inst. Code, § 14081.)

Regulations to implement the Medi-Cal program are found at California Code of Regulations, title 22, division 3 (§ 50000 et seq.) (Medi-Cal Regulations). To participate as a provider of health services in the Medi-Cal

program, a hospital must, among other things, be licensed as required by the Health and Safety Code. (Cal. Code Regs., tit. 22, § 51207, subd. (a)(2).)

2. *Hospital Licensing Requirements*

No person or organization may operate a health facility in California without first obtaining a license from the Department. (Health & Saf. Code, § 1253.) A general acute care hospital is a type of health facility "having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services." (Health & Saf. Code, § 1250, subd. (a).)

If the management of a hospital desires its facility to provide certain special services beyond the basic services authorized in the license, it must obtain a special permit to do so. (Health & Saf. Code, §§ 1251.5, 1252, 1255.) An "[i]ntensive care newborn nursery" is such a special service. (Health & Saf. Code, § 1255, subd. (f).)

The Department may not grant a license or a special permit unless the applicant demonstrates its hospital is operated in the manner required by statute and by Department regulations. (Health & Saf. Code, § 1277.) The Department's licensing regulations are published in the California Code of Regulations, title 22, division 5 (§ 70001 et seq.) (Licensing Regulations).

Plaintiff Sierra Vista Regional Medical Center (Sierra Vista) is licensed to be operated as a general acute care hospital. Sierra Vista is also authorized to provide intensive care newborn nursery services. Its nursery may have 10 intensive care bassinets. As authority to conduct this service, Sierra Vista's license simply reads: "NICU, ten bassinets."

One of the Licensing Regulations regarding the provision of intensive care newborn nursery services plays a pivotal role here. The contested regulation reads: "[a] ratio of one registered nurse to two or fewer intensive care infants shall be maintained." (Cal. Code Regs., tit. 22, § 70485, subd. (d).) Sierra Vista did not maintain this ratio.

## FACTS

The parties adopt the statement of facts in the final administrative decision issued in this case. We will quote from it in relevant part. The Department and Sierra Vista entered into a selective provider agreement effective May

30, 1991. Sierra Vista agreed to render "inpatient services" to any eligible Medi-Cal beneficiary and to be reimbursed for its services according to the rates set forth in the agreement. During the majority of time relevant to this appeal, the agreement established the following reimbursement rates:

"(d) [F]or inpatient services provided to beneficiaries, the all-inclusive rate per patient per day of $720; except that

"(e) For obstetrical inpatient services provided to beneficiaries in Provider's obstetrics unit . . . the all-inclusive rate per patient per discharge of $1253; and

"(f) For inpatient services provided to beneficiaries in Provider's Neonatal Intensive Care Unit [(NICU)] . . . , the all-inclusive rate per patient per day of $864." (These rates subsequently changed to $740, $765, and $890, respectively.)

The agreement also required Sierra Vista to maintain complete records regarding its direct and indirect costs of whatever nature incurred in rendering inpatient services, even though Sierra Vista was not reimbursed based on those costs. It was reimbursed based solely on the rates established in the provider agreement.

On February 1, 2000, the Department completed an audit of Sierra Vista's contract payments and cost reports for the fiscal year ending July 31, 1997. The audit included reviewing the number of patient days incurred in Sierra Vista's NICU and the Department's reimbursement for all of those days at the higher reimbursement rate established in the provider agreement.

The auditor wrote: "Under [Sierra Vista's] policies and procedures in effect during the audit period, newborns, including Medi-Cal-covered newborns, admitted to [Sierra Vista's] NICU could receive services at four different acuity levels of care, designated Levels 1 through 4. The levels of nursing care afforded to newborns assigned to these acuity levels were as follows: Level 1 - 4:1 ratio [four newborns per one nurse]; Level 2 - 3:1 ratio; Level 3 - 2:1 ratio; and Level 4 - 1:1 ratio."

Based on Sierra Vista's staffing policies, the auditor determined some of the patients Sierra Vista had admitted into its NICU received inpatient services at the 3:1 and 4:1 nursing ratios, below the 2:1 ratio required by the Licensing Regulations to be maintained when caring for "intensive care infants." (Cal. Code Regs., tit. 22, § 70485, subd. (d).) The auditor determined levels 1 (4:1 ratio) and 2 (3:1 ratio) were "subintensive care units" as

defined in what she referenced as "HCFA Pub 15-1, Section 2202.7IIB (W/P IIB-3.2)."[1] According to the auditor, Levels 1 and 2 are considered part of general routine care, not intensive care or NICU under the Licensing Regulations, and services provided at that level of care can be reimbursed only at the general rate.

The auditor asked Sierra Vista to provide information by which she could specifically determine which NICU patients received nursing care at Levels 1 and 2, and which received care at Levels 3 and 4. Sierra Vista was unable to provide sufficient information to make this determination.

As a result, "[t]he auditor reduced all NICU days billed [by Sierra Vista] to Medi-Cal to the general all-inclusive rate in effect on the dates of service. [Sierra Vista] was unable to provide logs, staff assignment sheets, or other reliable, auditable data which would have permitted identification of those neonatal intensive care days where care at acuity Levels 3 and 4 was provided. The total disallowance related to the NICU was $216,012. The accuracy of the mathematical computation of this amount was not contested."

### PROCEDURAL HISTORY

Sierra Vista challenged the auditor's determination in an administrative appeal. It contended the level of care provided to all of its NICU patients, including that provided at the nurse/patient ratio of 1:3 and 1:4, was allowed under Health and Safety Code section 1255.5.[2] It also argued the level of care was consistent with the plain language of the contract requiring the Department to reimburse it at the higher rate for all "inpatient services" rendered in its NICU, and the reduction in payments was therefore invalid.

The administrative law judge denied the appeal. He first determined the Department had adopted a regulatory procedure called "Program Flexibility," by which the Department could authorize exceptions to the Licensing Regulation's requirements. (See Cal. Code Regs., tit. 22, § 70129.) Because Sierra Vista made no showing it had been granted Program Flexibility, the

---

[1] We presume the auditor was referring to cost accounting directives prepared by the federal Health Care Financing Administration (HCFA) (now known as the Centers for Medicare and Medicaid Services (CMS)). (42 C.F.R. § 400.200 (2002).) CMS administers the federal Medicare program, the federal equivalent of Medi-Cal.

[2] The statute defines "intensive care newborn nursery services" as "the provision of comprehensive and intensive care for all contingencies of the newborn infant, including intensive, intermediate, and continuing care. Policies, procedures, and space requirements for intensive, intermediate, and continuing care services shall be based upon the standards and recommendations of the American Academy of Pediatrics Guidelines for Perinatal Care, 1983." (Health & Saf. Code, § 1255.5, subd. (f).)

judge concluded "the only services approved to be offered in its NICU are those which meet the requirements set forth in the applicable licensing provision, section 70485, . . . services where the [nursing staff-to-patient] ratio is 1:1-2." The administrative law judge also determined the language in the contract was subject to the definitions provided in the Licensing Regulations. The Department adopted the administrative law judge's ruling as its final ruling.

Sierra Vista challenged the adverse audit adjustment and the Department's final ruling by filing a petition for writ of administrative mandate. In its petition and points and authorities, Sierra Vista claimed the terms of the provider agreement were unambiguous—it was to be reimbursed at the higher rate for all "inpatient services" provided to Medi-Cal patients in its NICU, regardless of the level of nursing staff provided to those patients.

Because this language was unambiguous, Sierra Vista argued, the court was not obligated to review pertinent statutes and regulations. Even if it did so, Sierra Vista's practice of providing different levels of nursing care in its NICU was consistent with Health and Safety Code section 1255.5's definition of "intensive care newborn nursery services" for purposes of its license and special permit. Sierra Vista claimed this statute controlled to the extent it conflicted with requirements in the Licensing Regulations.

The trial court denied the petition. The court acknowledged the contract was silent on the issue of nurse staffing ratios, but ruled the contract had to be interpreted in conjunction with the Licensing Regulations' prescribed ratios. Since these regulations existed when the parties entered into the contract, Sierra Vista was deemed to contract with reference to them. Also, the contract specifically incorporated the Licensing Regulations as governing authority for construing its terms.

The court recognized Health and Safety Code section 1255.5 defined "intensive care newborn nursery services" to include "intensive, intermediate, and continuing care" without reference to staffing ratios. However, the statute incorporated the standards of the American Academy of Pediatrics Guidelines for Perinatal Care (1983) that identified "intensive care" at the nurse-to-patient ratios of 1:1 and 1:2, consistent with the Licensing Regulations. Taken together, the contract, the Licensing Regulations and the statutes indicated the parties intended to reimburse Sierra Vista for NICU services provided only to infants cared at a nurse-to-patient ratio of 1:1 and 1:2. The trial court did not address the concept of Program Flexibility relied upon by the administrative law judge.

The trial court entered judgment against Sierra Vista on April 30, 2002. Sierra Vista timely appealed.

DISCUSSION

I

*Standard of Review*

■ "Generally, on appeal, even where the trial court was required to review the challenged administrative decision under the independent judgment standard [which is not the case here], the standard of review of the trial court's determination remains the substantial evidence test. (*Fukuda v. City of Angels* [(1999) 20 Cal.4th 805,] 824[85 Cal.Rptr.2d 696, 977 P.2d 693].) However, on appellate review, to the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate level. [Citations.]" (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204 [99 Cal.Rptr.2d 357].).

■ The interpretation of a contract is a question of law unless the interpretation turns on the credibility of extrinsic evidence. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 501 [65 Cal.Rptr.2d 438].) The trial court here relied only upon statutes and regulations either expressly incorporated into the contract or made relevant under Sierra Vista's license to operate an NICU. Obviously, the credibility of these laws was not before the trial court. Hence, we will interpret the contract de novo. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

II

*Interpretation of the Service Provider Agreement*

■ Sierra Vista argues the plain language of the agreement entitled it to the higher rate of reimbursement for all "inpatient services" provided in its NICU when those services were provided at a nurse-to-patient ratio of 1:3 and 1:4 as well as 1:1 and 1:2. It asserts the trial court erred by looking beyond the contract's language to apply the Licensing Regulations to interpret the contract otherwise. We disagree.

■ "Interpretation of a contract consists in ascertaining the meaning to be given to the expression of the parties. (See [Civ. Code, §] 1635 et seq.; [citations].)

"Where the language of a contract is clear and not absurd, it will be followed. ([Civ. Code, §] 1638; [citations].) But if the meaning is uncertain,

certain general rules of interpretation are to be applied. ([Civ. Code, §] 1637; [citations].)" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 681, p. 615.)

"[T]he rules of interpretation of written contracts are for the purpose of ascertaining the meaning of the *words used* therein; evidence cannot be admitted to show intention independent of the instrument. [Citations.]" (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 684, p. 617, italics in original.)

"The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." (Civ. Code, § 1645.)

 "All applicable laws and ordinances in existence when the agreement is made become a part thereof as fully as if incorporated by reference. [Citations.] [¶] The rule favoring a lawful interpretation is often applied where legal performance is dependent upon compliance with governmental regulations; it will be presumed that the parties did not intend to perform except upon such compliance. [Citations.]" (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 692, pp. 625-626.)

A. *Terms of the agreement*

 This appeal turns on the meaning of the phrase "inpatient services provided to beneficiaries in [Sierra Vista's] Neonatal Intensive Care Unit." We look first to the language of the agreement. The agreement defines "inpatient services" broadly to include "[m]edical, nursing, surgical, pharmacy and dietary services[,] . . . physicians' services, . . . [u]se of hospital facilities, . . . [and] [a]ll other services provided to hospital inpatients" not specifically excluded by the contract.

The agreement did not define "neonatal intensive care unit," or the phrase used in the Licensing Regulations, "newborn intensive care nursery service." However, the agreement did not specifically exclude such services from its definition of "inpatient services."

The parties expressly intended the words and terms used in the agreement would "have their usual meanings *unless* a particular or more limited meaning is associated with their usage in Sections 14000, et seq. of the Welfare

and Institutions Code, or Title 22 of the California Code of Regulations pertaining to the rendition of health care . . . ." (Agreement, § 2.1., italics added.)

The parties further agreed the contract would be "governed and construed" in accordance with "Part 3, Division 9 of the Welfare and Institutions Code [the Medi-Cal statutes]; [and] Divisions 3 [the Medi-Cal Regulations] and 5 [the Licensing Regulations] of Title 22 of the California Code of Regulations . . . ." They also agreed the contract would be governed and construed in accordance with title 42 of the Code of Federal Regulations.

We may not decide this case simply by resting on the agreement's definition of "inpatient services," as Sierra Vista would have us do. Otherwise, we would be interpreting the agreement to require the Department to reimburse Sierra Vista at the higher rate no matter what type of service is provided to newborns in the NICU and whether or not the services were provided in conformance with the laws governing the operation of a NICU. Although the CMAC had broad discretion to negotiate provider agreements, it had no discretion or authority to agree to a hospital's providing inpatient services in a manner contrary to that required by law.

Moreover, the agreement itself requires us to interpret the phrase according to a particular or more limited meaning if such exists in the Medi-Cal Regulations, the Licensing Regulations, or regulations governing the federal Medicare program. Indeed, the parties agreed any provision of the contract "in conflict with the laws or regulations [mentioned above] is hereby amended to conform to the provisions of those laws and regulations. Such amendment of the Contract shall be effective on the effective date of the statute or regulation necessitating it, and shall be binding on the parties even though such amendment may not have been made [according to the contract's provisions regarding amendments.]"

We thus turn to those regulations to determine if they impose a meaning on the disputed phrase narrower than that proposed by Sierra Vista.

B. *The Medi-Cal Regulations*

The Medi-Cal Regulations define the types of "inpatient services" covered by the Medi-Cal program. Since these regulations establish the parameters within which the Department may reimburse hospitals through the Medi-Cal program, the provider agreement here obviously could not authorize services and reimbursements beyond that allowed by the Medi-Cal Regulations.

The regulations define inpatient care for newborns as a reimbursable cost as follows: "Hospital care for newborns is covered, subject to the following:

"1. Nursery care for well newborns during the same hospital admission associated with the delivery is not separately reimbursable.

"2. Nursery care for sick newborns, who do not require neonatal intensive care, but who require an acute level of care during the same hospital admission associated with the delivery, is separately reimbursable under the following circumstances:

"a. For contract hospitals reimbursed on a per diem basis, timely submission of a request for authorization for Medi-Cal field office review . . . is required for services provided to the newborn beginning with the day of the mother's discharge, or as dictated by the terms of the hospital's contract. [¶] . . . [¶]

"4. Neonatal intensive care is covered, commencing with the onset of the newborn's illness and admission to the Neonatal Intensive Care Unit (NICU), subject to timely submission of a request for authorization for Medi-Cal field office review . . . or as dictated by the terms of the hospital's contract." (Cal. Code Regs., tit. 22, § 51327, subd. (a)(1)(B).)

The Medi-Cal Regulations thus recognize two types of services for ill newborns which can be reimbursed separately from that reimbursed for a healthy newborn. Services for the latter are reimbursed as part of the obstetrical services rendered to both the mother and the newborn. Services for ill newborns who remain in the hospital beyond what a healthy newborn would are reimbursed separately from the obstetrical services rendered.

Of importance here, the regulation notes intensive care begins when the newborn enters the NICU. Other types of care for ill newborns occur outside the NICU. This suggests a NICU is not defined merely by the title given to it, but by the type of patients who are admitted there due to the severity of their illnesses *and* by the level of services required by license to be provided there.

C. *The Licensing Regulations*

The Licensing Regulations define "intensive care service" as a "nursing unit in which there are specially trained nursing and supportive personnel and diagnostic, monitoring and therapeutic equipment necessary to provide specialized medical and nursing care to critically ill patients." (Cal. Code Regs., tit. 22, § 70491.) The regulations define "intensive care newborn nursery service" in pertinent part to mean "the provision of comprehensive and intensive care for all contingencies of the newborn infant." (Cal. Code

Regs., tit. 22, § 70481.) An intensive care newborn nursery service is required to provide "[c]omprehensive care for all life-threatening or disability-producing situations." (Cal. Code Regs., tit. 22, § 70483, subd. (a)(1).)[3]

The Licensing Regulations detail the types of services required to be provided in a NICU, the types of policies to be adopted by the hospital for operating a NICU, the physician and nursing staffing to be maintained in a NICU, and the equipment and supplies to be housed in a NICU. (Cal. Code Regs., tit. 22, §§ 70483, 70485, 70487.) Of critical importance here, the Licensing Regulations require a "ratio of one registered nurse to two or fewer intensive care infants shall be maintained" in the intensive care newborn nursery. (Cal. Code Regs., tit. 22, § 70485, subd. (d).)

Thus, under the Licensing Regulations, an acute care hospital may provide neonatal intensive care services on condition the NICU continuously maintains a nursing staff ratio of 1 nurse per every 1 or 2 patients.

D. *Medicare regulations*

In general, the Medicare regulations allow hospitals to be reimbursed based in part on the average reasonable costs incurred for routine patient care, except that a hospital may be reimbursed based on a separate average cost per diem for each intensive care unit. (42 C.F.R. § 413.53(a)(1) (2002).) However, for purposes of determining costs, a unit will be identified as an intensive care inpatient hospital unit only if the unit, among other things, "[m]aintains a minimum nurse-patient ratio of one nurse to two patients per patient day." (42 C.F.R. § 413.53(d)(5) (2002).)

We, as did the Department's auditor, acknowledge the parties intended to reimburse Sierra Vista based on the rates in the agreement, not based on the Medicare formula of reimbursing based on reasonable cost. Nonetheless, we are required by the agreement to interpret its terms consistent with the meanings of terms used in the regulations discussed above, including the Medicare cost reimbursement regulations. These regulations make clear a NICU was not a unit where any service could be provided. Rather, it was a unit where certain services could be provided subject to the unit maintaining certain conditions. The significant extra costs incurred in maintaining those conditions justified reimbursing those costs differently than the hospital's other inpatient care costs.

---

[3]The Medi-Cal Regulations use the phrases "neonatal intensive care" and "Neonatal Intensive Care Unit," while the Licensing Regulations use the term "intensive care newborn nursery service" and "intensive care newborn nursery." We use the terms interchangeably. "Neonatal" is commonly defined as "of, relating to, or affecting the newborn and especially the human infant during the first month after birth." (Webster's 3d New Internat. Dict. (1981) p. 1516.)

These regulations existed at the time the parties entered into the provider agreement. Thus, Sierra Vista knew at that time any services it provided in its NICU could only be treated as intensive care services if they satisfied the regulations discussed above. Because these meanings are used specifically in the regulations, and because the contract requires us to interpret its terms according to those meanings, we must reject Sierra Vista's assertion it was authorized to be reimbursed for any service it provided in its NICU, regardless of its failure to satisfy the nursing standards required for intensive care services rendered in its NICU.

## E. *Licensing statutes*

In opposition, Sierra Vista argues the statutory definition of "intensive care newborn nursery services" is broader than that provided in the Licensing Regulations, and should control here. We disagree.

Health and Safety Code section 1255.5, a hospital licensing statute, defines "[i]ntensive care newborn nursery services" as "the provision of *comprehensive* and *intensive* care for all contingencies of the newborn infant, *including intensive, intermediate, and continuing care.* Policies, procedures, and space requirements for intensive, intermediate, and continuing care services shall be based upon the standards and recommendations of the American Academy of Pediatrics Guidelines for Perinatal Care, 1983." (Health & Saf. Code, § 1255.5, subd. (f), italics added.) Sierra Vista argues this statute allows it to provide "intermediate" and "continuing" care in its NICU, levels of care which do not require the minimum 1:2 nursing ratio.

Neither party attempted to introduce into the record relevant portions of the standards contained in the American Academy of Pediatrics Guidelines for Perinatal Care, 1983 (Guidelines), even though those standards are incorporated into the statutory definition of "intensive care newborn nursery services." There is also no indication the administrative law judge or the trial court reviewed them under a grant of judicial notice.[4] Sierra Vista bore the duty of providing this court with an adequate record. It cannot show error in the application of a statute which incorporates provisions by reference without providing the full text of the referenced material. Having failed to

---

[4]In its posthearing brief before the administrative law judge, the Department asserted: "It is the Department's *understanding* that the Pediatric Guidelines provide that the nurse to patient ratio for intensive care be one nurse to one or two newborn(s). Thus, the Pediatric Guidelines are consistent with title 22, section 70485's requirement of a single nurse to two or fewer intensive care infants." (Italics added.)

Despite the lack of any evidence in the record, the administrative law judge, in what became the Department's final decision, stated: "The above referenced Guidelines, under the general category of 'Neonatal Care,' identify three levels of care, i.e., Intensive care at the

meet its burden to produce evidence, Sierra Vista cannot succeed on this point.

Even if the Guidelines had been submitted into evidence, we would have affirmed the trial court's ruling. To explain our reasoning, and only for this purpose, we take judicial notice of the Guidelines under Evidence Code section 451.

The Guidelines describe four functional units of pediatric patient care: normal newborn care; continuing care, intermediate care, and intensive care. Not all hospitals provide all levels of care, but a hospital which provides intensive care should provide all other levels of care. (Guidelines, p. 23.)

Regarding "intensive care," the Guidelines state in relevant part: "Constant nursing and continuous cardiopulmonary and other support for severely ill infants should be provided in the intensive care area. . . . [¶] Not only the number of nursing, medical, and surgical personnel, but also the amount and complexity of equipment required, is considerably greater in intensive care areas than in other perinatal areas." (Guidelines, pp. 29-30.) The Guidelines recommend a nurse/patient ratio of 1:1 or 1:2 in a hospital's NICU. (Guidelines, p. 39.)

Regarding "intermediate care," the Guidelines state: "Sick neonates *who do not require intensive care* but require 6-12 nursing hours each day should be taken to the intermediate care area. . . . [¶] The intermediate care area should be *close to* the delivery/cesarean birth room and the *intensive care area . . . .*" (Guidelines, p. 29, italics added.) The Guidelines recommend a nurse/patient ratio of 1:3 or 1:4 in a hospital's intermediate care area. (Guidelines, p. 39.)

Regarding "continuing care," the Guidelines state: "Low-birth-weight neonates who are not sick but require frequent feeding, and neonates who no

1:1-2 staffing ratio, Intermediate care at the 1:3-4 staffing ratio, and Continuing care, at the 1:4 staffing ratio. The four acuity levels of nursing care established by the Provider fall within the ratios set forth in the Guidelines."

The administrative law judge, however, determined the Department under statutory authority had adopted the 1:2 nurse-to-patient ratio as the only approved nursing ratio for services offered in an NICU. The hospital could seek exceptions to this standard (see Cal. Code Regs., tit. 22, § 70129), but Sierra Vista did not. In the absence of such an approved exception, Sierra Vista was required to maintain the 1:2 ratio for all patients placed in the NICU.

In denying the petition for writ of mandate, the trial court also cited to the Guidelines, but again no evidence of the Guidelines was ever submitted before it. Apparently relying on the statements by the administrative law judge, the trial court asserted the Guidelines identified " 'intensive care' at the nurse/patient ratios of 1:1 and 1:2, consistent with the regulations cited from 22 CCR 70485(d)."

longer require intermediate care but still require more hours of nursing than normal neonates should be taken to the continuing care area. This area should be *close to the intensive and intermediate care areas.*" (Guidelines, p. 28, italics added.) The Guidelines recommend a nurse/patient ratio of 1:4 in a hospital's continuing care area. (Guidelines, p. 24.)

Finally, regarding "newborn nursery," the Guidelines state: "Routine nursery care of apparently normal fullterm or preterm neonates who weigh more than 2000 [grams] at birth and have demonstrated successful adaptation to extrauterine life is provided in the newborn care area." (Guidelines, pp. 26-27.) The Guidelines recommend a nurse/patient ratio of 1:6 to 1:8 in a hospital's healthy newborn nursery care area. (Guidelines, p. 39.)

From the above, we discern the Guidelines did not intend intensive, intermediate, and continuing levels of care all to be considered as part of intensive care. Rather, the Guidelines consider each level of care to be part of providing comprehensive care to address all contingencies that could arise in caring for a newborn infant. The three levels of care are provided at different locations in the hospital. Most importantly, a hospital which chooses to provide intensive care has to provide all other levels of care (comprehensive care) to newborns.

Thus, Health and Safety Code section 1255.5 cannot mean what Sierra Vista proposes. Otherwise, the statute would contradict the Guidelines it incorporates as the governing standard by which a hospital cares for newborns. The statute's reference to "comprehensive and intensive" care merely reflects the Legislature's desire, consistent with the Guidelines' recommendations, to ensure a hospital which provided intensive care services also provided all other levels of services required to care for all contingencies of newborn health.

### III

*Department's Denial of Higher Reimbursement Rate for NICU Services Rendered at 1:1 or 1:2 Nurse/Patient Ratio*

■ Sierra Vista argues the Department acted arbitrarily and capriciously in determining not to reimburse Sierra Vista for NICU services provided at the appropriate nurse-to-patient ratio, even though Sierra Vista was unable to produce any documentation by which the auditor could have made such a determination.

Sierra Vista failed to raise this argument both on its administrative appeal and before the trial court on its petition for writ of mandate. Having failed to

do so, Sierra Vista is deemed to have waived the argument on appeal. (*NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 336-337 [70 Cal.Rptr.2d 237].)

## DISPOSITION

The judgment of the trial court is affirmed. Costs on appeal are awarded to the Department.[5]

Hull, J., and Kolkey, J., concurred.

---

[5]In light of our ruling, we need not address the Department's motion to strike various references in Sierra Vista's papers to various unpublished administrative and judicial decisions.