[No. B211594. Second Dist., Div. Two. Dec. 17, 2009.]

COUNTY OF KERN, Plaintiff and Appellant, v.
STATE DEPARTMENT OF HEALTH CARE SERVICES, Defendant and
Respondent.

1506

---

---

## COUNSEL

Foley & Lardner, Tami S. Smason, Diane Ung and Jeffrey R. Bates for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Richard T. Waldow and Gregory M. Cribbs, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**ASHMANN-GERST, J.**—County of Kern operates the Kern Medical Center (collectively Kern). Kern challenges the decision of respondent State Department of Health Care Services (Department) to reduce Kern's Medi-Cal reimbursements by $2,295,367. According to the Department, Kern should have been paid $925 per patient day instead of $1,125 per patient day for services provided to patients in its neonatal intensive care unit when the nurse-to-patient staffing ratios exceeded one to one or one to two. When Kern pursued an administrative appeal, the Department upheld the legal basis for the reduction by citing *Sierra Vista Regional Medical Center v. Bonta´* (2003) 107 Cal.App.4th 237 [132 Cal.Rptr.2d 9] (*Sierra Vista*). In addition, the Department found that the auditor properly calculated the nurse-to-patient staffing ratios by using Kern's assignment sheets. On appeal from the denial of its petition for writ of mandate, Kern contends that *Sierra Vista* was wrongly decided and should not be followed, and that the Department's methodology for calculating the nurse staffing ratios was arbitrary and capricious.

We find no error and affirm.

## FACTS

*The Medi-Cal contract*

The Department and Kern entered into a contract for hospital inpatient services (Medi-Cal contract). Amendment No. 14 to the Medi-Cal contract, effective February 21, 1997, provided that the Department would pay Kern the all-inclusive rate per patient per day of $925 for inpatient services provided to Medi-Cal beneficiaries. As an exception, amendment No. 14 provided that "[f]or inpatient neonatal intensive care services provided to beneficiaries in [Kern's] licensed neonatal intensive care unit and billed under Universal Billing Code 175," the Department would pay the all-inclusive rate per patient per day of $1,125. Amendment No. 14 was in effect until it was supplanted by amendment No. 28 in 2002.

The Medi-Cal contract provided that it "shall be governed and construed in accordance with" division 9, part 3 of the Welfare and Institutions Code; divisions 3 and 5 of title 22 of the California Administrative Code (now, Cal. Code Regs.); all other applicable state laws and regulations; titles 42 and 45 of the Code of Federal Regulations; and all other applicable federal laws and regulations.

*The audit adjustments*

On April 30, 2004, the Department issued an audit of Kern's cost report. The Department concluded that Kern had been overpaid $2,295,367 during three fiscal years for service provided in the neonatal intensive care unit because it did not meet the staffing requirements in California Code of Regulations, title 22, section 70485, subdivision (d) ("A ratio of one registered nurse to two or fewer intensive care infants shall be maintained.").

*The administrative appeal*

Kern requested a formal hearing with respect to the Department's audit adjustments.

At the hearing, Byron Chell (Chell) testified. Before he retired, he worked as general counsel and then executive director for the California Medical Assistance Commission (Commission). The Commission negotiated contracts with hospitals that provided inpatient services to medical beneficiaries. When he negotiated and recommended amendment No. 14, he had "no concern for the nurse staffing ratio." In his view, the Commission intended that the $1,125 rate in amendment No. 14 would apply to inpatient neonatal intensive care services regardless of the nurse-to-patient staffing ratios.

The administrative law judge issued a proposed decision denying the appeal. In its summary, the proposed decision stated that where a contract allows a higher rate of reimbursements "for inpatient services provided in the [neonatal intensive care unit], that rate is payable only for those infants admitted to the [neonatal intensive care unit] that receive services based upon a ratio of one registered nurse to two or fewer infants." To support this conclusion, the administrative law judge cited the California Code of Regulations and *Sierra Vista*.

Regarding the calculation of nurse staffing ratios, the proposed decision stated: "The Department's audit adjustments were based upon a review of [Kern's] staffing assignment sheets. The Department excluded the charge nurse and back-up charge nurse from the registered nurse count unless these nurses had one or two patients specifically assigned to their care on those assignments." Even "though the assignment sheets did not often reflect the specific patient assignments for the charge nurse and/or back-up charge nurse, it proffered the testimony of a charge nurse to establish that, regardless of those sheets, she spent most of her time providing direct patient care to patients in the [neonatal intensive care unit]. The testimony [did] not bear this out. Between 20 to 25 percent of her time was not even spent in the [neonatal intensive care unit], but, rather, in the labor and delivery room assisting in the

delivery of babies. Of the remainder of her shift when she was actually in the [neonatal intensive care unit] her duties were split between providing administrative and supervisory functions and providing direct patient care. In determining the extent of that direct patient care, the Department reasonably relied on the assignment sheets. They were made at or near the time that the services were provided, and reflect the best evidence as to whom the services were provided. In those instances that clearly established that the charge nurse or back-up charge nurse was directly assigned to a patient's care[,] [Kern] received the proper reimbursement."

The Department adopted the proposed decision.

### Trial court proceedings

Kern filed a petition for writ of mandate challenging the Department's audit adjustments. The petition alleged: Kern operates a 28-bed neonatal intensive care unit which provides the high level of care needed by seriously ill newborns. The newborns treated in the neonatal intensive care unit have medical conditions that mandate their placement there, and none of these patients can or should be treated outside of the neonatal intensive care unit, such as in Kern's normal newborn nursery. For 12 years, the Department paid Kern at the rate of $1,125 per day for all neonatal intensive care unit services without any reference to nurse staffing ratios. The audit report issued on April 30, 2004, contained adjustments for fiscal years ending June 30, 1999, June 30, 2000, and June 30, 2001. For a substantial number of days, the Department reduced the payment rate from the neonatal intensive care unit rate of $1,125 per day to the general inpatient rate of $925 per day. The Department based its audit adjustments on the conclusion that Kern was not entitled to $1,125 per patient day unless it had a one-to-one or one-to-two nurse-to-patient ratio. Kern alleged that the Department misinterpreted the Medi-Cal contract as requiring specific staffing. Alternatively, it alleged that the Department failed to include the time worked by the charge nurses and backup charge nurses when calculating the nurse staffing ratios.

The trial court denied the petition. Following *Sierra Vista*, it confirmed the Department's interpretation of the Medi-Cal contract. Regarding staffing ratios, the trial court stated: "The [Medi-Cal] contract requires Kern [to] maintain records of all direct and indirect costs for audit. . . . It cannot rely on unauditable and unverifiable charging nurse testimony to support its position."

Judgment was entered in favor of the Department.

This timely appeal followed.

## STANDARD OF REVIEW

When reviewing the denial of a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5, we ask whether the public agency committed a prejudicial abuse of discretion. "Abuse of discretion is established if the [public agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); see *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 738 [22 Cal.Rptr.2d 618].)

## DISCUSSION

### I. *The Department properly interpreted the Medi-Cal contract.*

■ The primary issue in this appeal is whether Kern was entitled to payment at the neonatal intensive care unit rate for services provided with a nurse staffing ratio greater than one to one or one to two. Based on *Sierra Vista*, the answer is no. *Sierra Vista* is from another district, so we are not bound by it. But we generally follow the decisions of other appellate courts unless there is good reason to disagree. (*Fire Ins. Exchange v. Abbott* (1988) 204 Cal.App.3d 1012, 1023 [251 Cal.Rptr. 620].) As we discuss below, we have no reason to depart from precedent.

The hospital in *Sierra Vista* provided four levels of care in its neonatal intensive care unit. Under the hospital's policies and procedures, the nursing ratios were: level one—one-to-four ratio; level two—one-to-three ratio; level three—one-to-two ratio; level four—one-to-one ratio. The auditor concluded that levels one and two were subintensive care units that were part of routine care, and services in those subintensive care units could only be reimbursed at the general rate. The hospital argued that Health and Safety Code section 1255.5, subdivision (f)[1] "allow[ed] it to provide 'intermediate' and 'continuing' care in its [neonatal intensive care unit], levels of care which do not require the minimum 1:2 nursing ratio." (*Sierra Vista, supra*, 107 Cal.App.4th at p. 250.) In other words, the hospital claimed it should be paid the higher rate for care at levels one and two. Because the hospital could not prove the levels of care it provided in its neonatal intensive care unit, the auditor reduced payment for all neonatal intensive care unit days to the general all-inclusive rate down from the higher intensive care rate. *Sierra Vista* held that the payments were properly reduced. (*Sierra Vista, supra*, 107 Cal.App.4th at p. 243.) To reach this conclusion, the court examined the

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

Medi-Cal regulations, the licensing regulations, the Medicare regulations and the licensing statutes incorporated into the hospital's contract.

■ California Code of Regulations, title 22, section 51327, subdivision (a)(1)(B) provides coverage for newborns, "subject to the following: [¶] 1. Nursery care for well newborns during the same hospital admission associated with the delivery is not separately reimbursable. [¶] 2. Nursery care for sick newborns, who do not require neonatal intensive care, but who require an acute level of care during the same hospital admission associated with the delivery, is separately reimbursable under the following circumstances: [¶] a. For contract hospitals reimbursed on a per diem basis, timely submission of a request for authorization . . . is required for services provided to the newborn beginning with the day of the mother's discharge, or as dictated by the terms of the hospital's contract. [¶] . . . [¶] 4. Neonatal intensive care is covered, commencing with the onset of the newborn's illness and admission to the [neonatal intensive care unit], subject to timely submission of a request for authorization . . . , or as dictated by the terms of the hospital's contract." (Cal. Code Regs., tit. 22, § 51327, subd. (a)(1)(B).) As *Sierra Vista* noted, the Medi-Cal regulations recognize two types of services for sick newborns: nursery care for sick newborns who do not require neonatal intensive care and nursery care for those who do. (*Sierra Vista, supra,* 107 Cal.App.4th at p. 248.)[2] And by its plain terms, the regulation permits coverage for neonatal intensive care only for newborns that need it.

The state licensing regulations for general acute care hospitals provide that "[a]n intensive care service is a nursing unit in which there are specially trained nursing and supportive personnel and diagnostic, monitoring and therapeutic equipment necessary to provide specialized medical and nursing care to critically ill patients." (Cal. Code Regs., tit. 22, § 70491.) In addition, the licensing regulations define intensive care newborn nursery service to mean "the provision of comprehensive and intensive care for all contingencies of the newborn infant" (Cal. Code Regs., tit. 22, § 70481); establish that an intensive care newborn nursery service shall provide "[c]omprehensive care for all life-threatening or disability-producing situations" (Cal. Code Regs., tit. 22, § 70483, subd. (a)(1)); set forth various requirements for an intensive care newborn nursery service staff, including that "[a] ratio of one registered nurse to two or fewer intensive care infants shall be maintained" (Cal. Code Regs., tit. 22, § 70485, subd. (d)); and provide a list of equipment and supplies that an intensive care newborn nursery must contain (Cal. Code Regs., tit. 22, § 70487).

---

[2] Regarding the various terms at play in the regulations, *Sierra Vista* stated: "The Medi-Cal Regulations use the phrases 'neonatal intensive care' and 'Neonatal Intensive Care Unit,' while the Licensing Regulations use the term 'intensive care newborn nursery service' and 'intensive care newborn nursery.' We use the terms interchangeably." (*Sierra Vista, supra,* 107 Cal.App.4th at p. 249, fn. 3.) The parties have adopted this approach, and so have we.

■ *Sierra Vista* concluded that "an acute care hospital may provide neonatal intensive care services on [the] condition [that] the [neonatal intensive care unit] continuously maintains a nursing staff ratio of 1 nurse per every 1 or 2 patients." (*Sierra Vista, supra,* 107 Cal.App.4th at p. 249.) Following the rules of statutory construction, we cannot find fault with this conclusion. ■ (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898 [95 Cal.Rptr.3d 183, 209 P.3d 89] [the rules of statutory construction apply to the interpretation of regulations].) Our task is to discern the agency's intent and give the regulatory language its plain, commonsense meaning. If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect. (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 288–289 [93 Cal.Rptr.3d 369, 206 P.3d 739].) In addition, we must harmonize a regulation with regulations relating to the same subject matter. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

■ In our view, the references to life-threatening and disability-producing situations, critically ill patients and intensive care newborns establish that the state regulations pertain to patients in the greatest jeopardy. They do not then, as argued by the hospital in *Sierra Vista,* apply to intermediate and continuing care. That is a commonsense reading. By inference, this explains why the regulations prescribe a high nurse-to-patient ratio.

■ The Medicare regulations also supported *Sierra Vista.* Under federal law, hospitals can be reimbursed based on an average cost per diem for each intensive care unit. (42 C.F.R. § 413.53(a)(1) (2009).) However, for purposes of determining costs under title 42 Code of Federal Regulations section 413.53, a unit will be identified as an intensive care inpatient hospital unit only if it "maintains a minimum nurse-patient ratio of one nurse to two patients per patient day." (42 C.F.R. § 413.53(d)(5).) Because the hospital's provider contract incorporated title 42 of the Code of Federal Regulations, *Sierra Vista* reasonably interpreted the contract to mean that a unit shall not be considered an intensive care unit absent a one-to-one or one-to-two nurse-to-patient ratio. (*Sierra Vista, supra,* 107 Cal.App.4th at p. 250.)

This brings us to a licensing statute, section 1255.5, subdivision (f).

Section 1255.5, subdivision (f) provides that " '[i]ntensive care newborn nursery services' means the provision of comprehensive and intensive care for all contingencies of the newborn infant, including intensive, intermediate, and continuing care. Policies, procedures, and space requirements for intensive, intermediate, and continuing care services shall be based upon the standards and recommendations of the American Academy of Pediatrics Guidelines for Perinatal Care, 1983."

The American Academy of Pediatrics's Guidelines for Perinatal Care (1983) (Guidelines) recommend: Neonates requiring constant nursing and continuous care because they are severely ill should be placed in a hospital's intensive care area. The hospital should maintain one-to-one or one-to-two nurse-to-patient ratio. Neonates not requiring intensive care but requiring six to 12 nursing hours each day should be taken to the immediate care area and have at least a one-to-two or one-to-three nurse-to-patient ratio. Low-birth-weight neonates who are not sick but require frequent feedings, and neonates who require more hours of nursing than normal neonates, should be taken to the continuing care area. There, the nurse-to-patient ratio should be one to three or one to four. (*Sierra Vista, supra,* 107 Cal.App.4th at pp. 251–252.)

Section 1255.5, subdivision (f) did not change the mind of the *Sierra Vista* court, and it does not change our mind.

■ The *Sierra Vista* court concluded that the Guidelines "did not intend intensive, intermediate, and continuing levels of care all to be considered as part of intensive care." (*Sierra Vista, supra,* 107 Cal.App.4th at p. 252.) It reasoned that if section 1255.5, subdivision (f) meant what the hospital proposed, it would conflict with the Guidelines. (*Sierra Vista, supra,* at p. 252.) The court opined that the statute's reference to comprehensive and intensive care in section 1255.5, subdivision (f) "merely reflects the Legislature's desire, consistent with the Guidelines' recommendations, to ensure a hospital which provided intensive care services also provided all other levels of services required to care for all contingencies of newborn health." (*Sierra Vista, supra,* at p. 252.) In essence, *Sierra Vista* equated intensive care newborn nursery services with intensive care in section 1255.5, subdivision (f) and held that neither includes intermediate and continuing care.

Like the hospital in *Sierra Vista,* Kern contends that the statute permitted it to render intermediate and continuing care in the neonatal intensive care unit. We acknowledge that on its face the statute defines intensive care newborn nursery services to include intensive, intermediate and continuing care and, through the Guidelines, specifies different nurse-to-patient ratios for each. Thus, it might be reasonable to interpret section 1255.5 as Kern suggests. But we need not reach that issue because it does not impact the outcome of this appeal.

Assuming Kern's interpretation of section 1255.5, subdivision (f) for the sake of argument, we note that the regulations are narrower because they suggest that intensive care for newborns involves critically ill patients and a one-to-one or one-to-two nurse-to-patient ratio. Since we are examining these laws in aid of interpreting the Medi-Cal contract, the rules of contract interpretation are useful to resolve the conflict. Our Civil Code provides that

"[p]articular clauses of a contract are subordinate to its general intent." (Civ. Code, § 1650.) Here, section 1255.5, subdivision (f) is the anomaly and must be considered subordinate. (*Bank of America v. Lallana* (1998) 19 Cal.4th 203, 209 [77 Cal.Rptr.2d 910, 960 P.2d 1133].) This is particularly so because the Medi-Cal contract was designed to reimburse Kern for its services to beneficiaries and therefore the regulations defining the scope of coverage are more important to understanding the intent of the Medi-Cal contract than a licensing statute. While section 1255.5, subdivision (f) lumps intensive, intermediate and continuing care together, California Code of Regulations, title 22, section 51327, subdivision (a)(1)(B) contains separate coverage provisions for care provided to sick newborns who need neonatal intensive care in the neonatal intensive care unit and to sick newborns who do not. The licensing regulations and Medicare regulations shed light on that division. Section 1255.5 does not.[3]

To the extent there is an ambiguity, Kern asks us to construe that ambiguity against the drafter of the Medi-Cal contract, the Department. We decline. We agree with *Sierra Vista*'s observation that the parties could not enter into a contract requiring payment not authorized under the Medi-Cal provisions. (*Sierra Vista, supra,* 107 Cal.App.4th at pp. 251–252.)

II. *The Department properly calculated the nurse-to-patient ratios.*

Kern contends that the Department acted in an arbitrary and capricious manner when it calculated the nurse-to-patient ratios based solely on assignment sheets, and when it refused to include the time spent by registered nurses in the neonatal intensive care unit unless they provided direct patient care. In Kern's view, the Department was required to include in its calculation the percentage of time charge nurses actually spent in the neonatal intensive care unit.

We disagree.

■  The Department bore the burden of demonstrating by a preponderance of the evidence that its audit findings were correct. After that, the burden of proof shifted to Kern to demonstrate by a preponderance of the evidence that its position was correct. (Cal. Code Regs., tit. 22, § 51037, subd. (i).)

---

[3] Kern informs us that an administrative law judge in another case concluded that a hospital was entitled to the higher rate even though the nurse staffing ratios were not one to one or one to two. Further, Kern says, the Department rejected the administrative law judge's proposed decision. But, because it waited too long to reject the proposed decision, the proposed decision became the final decision. The fact that there may be a final decision by the Department that conflicts with *Sierra Vista* is not grounds for us to reject *Sierra Vista*'s holding.

The Medi-Cal contract provides that Kern "shall maintain books, records, documents, and other evidence, accounting procedures, and practices sufficient to reflect properly all direct and indirect costs . . . incurred." It also provides that Kern shall "maintain medical records . . . and other records related to a beneficiary's eligibility for services, the services rendered, the beneficiary to whom the service was rendered, the date of the service, the medical necessity of the service and the quality of the care provided." Based on the foregoing, and as the trial court noted, it was reasonable for the Department to calculate nurse staffing ratios using data from Kern's records. And we agree with the administrative law judge that the Department "met its original burden of proof on these adjustments by establishing that the assignment sheets portray an accurate accounting of the ratio of nurse to patient in the [neonatal intensive care unit]."

Tacitly, Kern contends that it met its burden of proof by offering the testimony of a charge nurse. She testified: Charge nurses admit, transfer and discharge patients and they assist physicians with procedures and attend all high-risk deliveries. They "spend quite a bit of time . . . in labor and delivery with resuscitation and stabilization of those newborns." From July 1, 1998, to January 2001, the neonatal intensive care unit had a charge nurse and a backup charge nurse. The backup charge nurse had patient assignments and the charge nurse sometimes did. The charge nurse and backup charge nurse did not do the charting in a patient's medical file; that was the duty of the primary care nurse. When asked if she had an estimate of how much time the charge nurse and backup charge nurse spent on providing care at a one-to-one or one-to-two nurse-to-patient ratio, the charge nurse testified: "As far as . . . coming up with the specific number of hours, I can't say." The amount of time the charge nurse spent in the neonatal intensive care unit varied day to day. She estimated she spent 75 percent to 80 percent of the time in the neonatal intensive care unit, and 90 percent of that time was spent on direct patient care.

Simply put, the charge nurse's testimony was insufficient to make Kern's case. She was unable to state how much time charge nurses and backup charge nurses spent on providing care at a one-to-one or one-to-two nurse-to-patient ratio. Beyond that, she merely estimated the time that charge nurses and backup charge nurses spent on direct patient care in the neonatal unit. Critically, this means that she did not provide testimony regarding particular payments that were reduced and establish that a reduction was improper even in light of *Sierra Vista*. Even if she had so testified, the Department would have been well within its power to reject it. The Department had every right to insist that Kern comply with the Medi-Cal contract and properly document the details necessary to determine benefits due to beneficiaries.

## DISPOSITION

The judgment is affirmed.

The parties shall bear their own costs.

Boren, P. J., and Doi Todd, J., concurred.