Filed 7/27/21 (mod.); Certified for Publication 7/30/21 (order attached following unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FAMILY HEALTH CENTERS OF SAN DIEGO, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STATE DEPARTMENT OF HEALTH CARE SERVICES, <br><br> Defendant and Respondent. | C089555 <br><br> (Super. Ct. No. 34-2018-80002953-CU-WM-GDS) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on July 6, 2021, be modified as follows:

1.     In the last partial paragraph starting at the bottom page 13 that begins with "We agree with the ALJ," delete the second sentence that begins with "Plaintiff's outreach efforts" and replace it with the following sentence:

1

Plaintiff's outreach efforts involve going into public spaces such as on the street, at schools, business venues, beaches, and parks to attract new patients from its audiences within the general public, provide counseling regarding eligibility for services, and make medical appointments for services.

2.     Delete the first sentence in the first full paragraph on page 14 that begins with "The regulations exclude costs" and replace it with the following sentence:

The regulations exclude costs that the program defines as not allowable, and the PRM makes clear that "[c]osts of advertising to the general public which seeks to increase patient utilization of the provider's facilities are not allowable."

3.     In the first full paragraph on page 14 that begins with "The regulations exclude costs," delete the sentence in the fourth line that begins with "The evidence showed" and replace it with the following sentence:

The evidence showed that plaintiff performed its outreach activities to "get the word out" about its various services to its audiences within the general public and "develop[ ] awareness of each clinic's presence, resources, cultural competence, and desire to serve among members of [plaintiff's] target populations."

This modification does not change the judgment.
The petition for rehearing is denied.

BY THE COURT:



          ROBIE          , Acting P. J.



          HOCH          , J.



          KRAUSE        , J.

3

Filed 7/6/21  Family Health Centers etc. v. State Dept. of Health Care Services CA3 (unmodified opinion)

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FAMILY HEALTH CENTERS OF SAN DIEGO, | C089555 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2018-80002953-CU-WM-GDS) |
| v. | |
| STATE DEPARTMENT OF HEALTH CARE SERVICES, | |
| Defendant and Respondent. | |

Plaintiff Family Health Centers of San Diego operates a federally qualified health center (FQHC) that provides various medical services to its patients, some of whom are Medi-Cal beneficiaries.  Under section 330 of the Public Health Service Act (42 U.S.C. § 201 et seq.), FQHC's like plaintiff also may provide additional health services, including (1) services designed to assist patients in establishing eligibility for and gaining access to federal and state assistance programs (such as Medi-Cal), (2) services that

1

enable individuals to use the health center's services (including outreach, transportation, and interpreter services), and (3) education regarding the availability and proper use of health services. (42 U.S.C. §§ 254b(b)(1)(A)(iii)-(v).)

Section 330 of the Public Health Service Act authorizes grants to be made to FQHC's. (42 U.S.C. §§ 254b, 1395x(aa)(4).) In addition, FQHC's may seek reimbursement under Medi-Cal for certain expenses, including reasonable costs directly or indirectly related to patient care. Plaintiff appeals from the trial court's order denying its petition for writ of mandate seeking to compel the State Department of Health Care Services (DHCS) to reimburse plaintiff for money it expended for outreach services.

We reject plaintiff's contention that the trial court and the DHCS improperly construed and applied applicable guidelines in the Centers for Medicare & Medicaid Services Publication 15-1, The Provider Reimbursement Manual (PRM). We conclude that the monies spent by plaintiff were not an allowable cost because they were akin to advertising to increase patient utilization of plaintiff's services. We therefore will affirm the trial court's denial of the petition for writ of mandate.

BACKGROUND

1.      *Statutory background*

The federal government provides financial assistance to states in order to provide medical care to low-income individuals through the Medicaid program. (42 U.S.C. § 1396 et seq.) California has implemented the program through Medi-Cal. (Welf. & Inst. Code, § 14000 et seq.; *Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751 (*Kennedy*).) The DHCS is the state agency designated to administer the Medi-Cal program. (Welf. & Inst. Code, § 14203.)

"Pursuant to Medi-Cal, participating health care providers, such as hospitals, receive reimbursement directly from the [DHCS] for providing medical care to Medi-Cal beneficiaries." (*Simi Valley Adventist Hospital v. Bontá* (2000) 81 Cal.App.4th 346, 348.) Providers are reimbursed for their allowable costs, as determined under

Medicare/Medicaid standards and principles of reimbursement set forth in the Code of Federal Regulations and the PRM. (*Oroville Hospital v. Department of Health Services* (2006) 146 Cal.App.4th 468, 472; see also Cal. Code Regs., tit. 22, § 51536, subds. (a)(2) & (b)(4); see also PRM; *Community Care Foundation v. Thompson* (2006) 412 F.Supp.2d 18, 22-23 [PRM provisions are interpretations of the Medicare regulations].) In general, to be reimbursable, claimed costs "must be based on the reasonable cost of [covered] services" and "related to the care of beneficiaries." (42 C.F.R. § 413.9(a) (2021); see also PRM § 2100 (rev. 454, 09-12) ["All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries"].) These federal regulations are incorporated into state law and apply to Medi-Cal providers such as plaintiff. (Welf. & Inst. Code, § 14132.100, subds. (e)(1) & (i)(2)(B)(ii).)

Under the federal regulations, "[r]easonable cost includes all necessary and proper expenses incurred in furnishing services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, if the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable." (42 C.F.R. § 413.9(c)(3) (2021).) The regulations define necessary and proper costs as "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity." (42 C.F.R. § 413.9(b)(2) (2021).)

Advertising costs are allowable if they are "incurred in connection with the provider's public relations activities [and are] primarily concerned with the presentation

3

of a good public image and directly or indirectly related to patient care. Examples are: visiting hours information, conduct of management-employee relations, etc." (PRM § 2136.1 (rev. 267, 09-82).) However, "[c]osts of advertising to the general public which seeks to increase patient utilization of the provider's facilities are not allowable. . . . While it is the policy of the [relevant federal agencies] to promote the growth and expansion of needed provider facilities, general advertising to promote an increase in the patient utilization of services is not properly related to the care of patients." (PRM § 2136.2 (rev. 267, 09-82).)

"The method by which the [DHCS] reimburses [Medi-Cal providers] is explained in detail in [*Kennedy, supra*, 13 Cal.4th 748]. Briefly stated, [Medi-Cal providers] receive interim estimated payments of Medi-Cal reimbursement during each fiscal year, with retroactive adjustments occurring at the end of each fiscal year when actual costs are known. (Cal. Code Regs., tit. 22, § 51536, subds. (c)(2) & (d).) Within four months of the end of each fiscal year, the [provider] submits a cost report based on actual costs. (42 C.F.R. § 413.24(f)(2)[ ].) The [DHCS] makes a tentative settlement based on the [provider's] unaudited cost report, making additional payments to the hospital if warranted. Following an audit which must be completed within three years (Welf. & Inst. Code, § 14170, subd. (a)(1)), the [DHCS] issues a final audit report and settlement." (*Little Company of Mary Hospital v. Belshé* (1997) 53 Cal.App.4th 325, 327, fn. omitted.)

"Consistent with [the] statutory authority [set forth in Welfare and Institutions Code section 14171], the regulations establish detailed appeal procedures applicable to the audit process, including an appeal from a final audit report. (Cal. Code Regs., tit. 22, § 51016 et seq.)" (*Kennedy, supra*, 13 Cal.4th at p. 758.) A Medi-Cal provider may request a hearing regarding disputed audit findings by submitting a statement of disputed issues to the DHCS. (Cal. Code Regs., tit. 22, § 51017.)

At the appeal hearing, the DHCS bears the burden of establishing by a preponderance of the evidence that its audit findings were correct. (Cal. Code Regs., tit. 22, § 51037, subd. (i).) After the DHCS has made a prima facie case, the burden shifts to the provider to demonstrate by a preponderance of the evidence that its position is correct. (*Ibid*.)

### 2. *Factual background*

#### a. *December 2016 audit and appeal*

In December 2016, the DHCS audited plaintiff's 2013 cost report and reclassified as nonreimbursable $78,032 in salary and benefit expenses that were for community outreach. The audit report noted (1) there was insufficient documentation demonstrating that the expenses were related to services and supplies incident to an FQHC visit, and (2) the expenses were not a covered benefit under Welfare and Institutions Code section 14132.100. The report further noted the documentation was insufficient under 42 Code of Federal Regulations parts 413.9, 413.20, and 413.24; PRM sections 2102, 2300, 2304, and 2328; sections 1395x(s)(2)(A), 1395x(AA)(1)(A)-(1)(C), 1396d(a)(2)(C), and 1396(d)(1)(2) of title 42 of the United States Code; and State Plan Amendments 09-001 and 09-015.

Plaintiff appealed the DHCS's determination in January 2017. After holding an informal hearing in March 2017, the hearing auditor upheld the adjustment in May 2017. The hearing auditor reasoned that Welfare and Institutions Code section 14132.100 defines the FQHC covered benefits reimbursable under the Medi-Cal program as physician services and services and supplies that meet the definition of being incident to an FQHC visit. The hearing auditor found that plaintiff had failed to demonstrate that its outreach encounters lead to an FQHC visit and a covered benefit under the Welfare and Institutions Code. In June 2017, plaintiff requested a formal hearing.

5

b.  *October 2017 hearing*

During the October 2017 hearing, Jeff Cates, a health program auditor for the DHCS, testified first. At the time, Cates had worked for over 17 years at the DHCS and had conducted approximately 200 audits. He agreed with the report's conclusion and testified to the accuracy of the basis for reclassification of plaintiff's outreach costs as nonreimbursable. Cates had reviewed plaintiff's salary detail, job descriptions for those providing outreach services, and state plan amendments and regulations. In Cates's opinion, plaintiff's outreach costs were not allowable under the applicable regulations.

Plaintiff's chief executive officer, Fran Butler-Cohen, testified next. She explained that plaintiff served low-income and diverse populations that often are unaware of the existence of affordable or free health care services. Plaintiff required its outreach workers to go into the community and make medical appointments for people with whom they came in contact, such as an outpatient visit, a pregnancy test, or entry into the prenatal program. In her experience, patients contacted by outreach workers had a "very high show rate," typically between 75 to 85 percent. It is plaintiff's practice to track the appointment rates for individual outreach workers and actual services received. She provided a sample billing ledger that lists the services that occurred for some of the patients that were contacted by outreach workers.

Butler-Cohen testified that, in her opinion, FQHC's are mandated by the federal government and the state to perform outreach services, and therefore such costs were allowable. She cited several documents in support of her opinion. For example, the DHCS's grant application form for FQHC's lists "outreach" in the "required services provided" section. As reflected in the application, plaintiff provided outreach services directly. As part of its nonclinical outreach, plaintiff also provided counseling regarding eligibility for services, counseling regarding HIV-related issues, and counseling to teens regarding sexual education and health. In addition, plaintiff provided outreach "for the specific purpose of developing awareness of each clinic's presence, resources, cultural

6

competence, and desire to serve among members of [plaintiff's] target populations." Plaintiff performed these tasks "in the street, in schools, in agen[cies], business venues [such as LGBTQ bars and clubs, etc.], [and] other public venues such as beaches and parks." Butler-Cohen testified that the purpose of the company's efforts was to "get the word out, so to speak, for the various services we provide."

Butler-Cohen also cited a document published by the Health Resources and Services Administration (which regulates plaintiff) titled "Program Requirements," which lists outreach as a required service to be provided by a FQHC like plaintiff. The document explains that "[o]utreach services are a broad range of culturally and linguistically appropriate activities focused on recruiting and retaining patients from the target population/service area. [¶] At a minimum, these services must promote awareness of the health center's services and support entry into care. [¶] These services do not involve direct patient care where a provider is generating a face-to-face visit with a patient, documenting the care in a patient medical record, or exercising clinical judgment in the provision of services to a patient." The document references section 330(b)(1)(A)(iv) of the Public Health Service Act and 42 Code of Federal Regulations part 51c.102(j)(14). She further testified about a "Policy Information Notice" published by the Health Resources and Services Administration, listing nonclinical outreach as a service that may be (and often is) provided by FQHC's. The document explains that "[i]f it is the policy of the grantee that staff conduct outreach where no clinical services are offered, the grantee should list the activity as 'non-clinical outreach.' "

Butler-Cohen testified that a 1994 letter from Sally Richardson, the then-Director of the federal Medicaid Bureau at the Department of Health and Human Services, addressed to the state Medicaid director states that Medicaid outreach is " 'an administrative cost necessary for the proper and efficient administration of the state plan.' " In Butler-Cohen's opinion, Richardson's letter established that outreach is an allowable expense.

7

Butler-Cohen also cited legislation and regulations that she believed supported her opinion regarding reimbursement for outreach costs. She testified that 42 Code of Federal Regulations part 51c.102(j)(14) defines "[s]upplemental health services" to include "[s]ervices, including the services of outreach workers, which promote and facilitate optimal use of primary health services and [other] services . . . ." She further opined that outreach was a required primary health care service under section 254b, subdivision (b)(1)(A)(iv) of title 42 of the United States Code.

Butler-Cohen testified regarding the former "Expanded Access to Primary Care" (EAPC) program, a state program designed to expand access to and improve the quality of outpatient health care for medically indigent persons. The program information defined reimbursable versus allowable services. For example, outpatient visits were allowable and reimbursed under certain circumstances, while "information sessions for prospective recipients [and] health presentations to community groups" were not reimbursable.

Similarly, the May 2010 Affordable Care Act (ACA) encouraged assistance to low-income individuals to access and appropriately use health services, enroll in health coverage programs, obtain a regular primary care provider or a medical home, provide case management and care management, perform health outreach using neighborhood health workers (which plaintiff had), provide transportation, expand capacity, and provide direct patient care services.

Butler-Cohen also testified regarding a Medi-Cal timeline produced by the DHCS. The document indicates that when the ACA was adopted in 2010, California received $10 billion to implement health coverage for low-income and uninsured individuals, and to improve care for vulnerable populations. To get matching federal funds under the ACA, California "funneled" vulnerable individuals from the "Healthy Families Program" into Medi-Cal. Outreach was necessary to ensure that these individuals were moved to Medi-Cal.

Butler-Cohen also testified about a 2012 letter from then-director of the DHCS, Toby Douglas. The letter discussed an initial plan to implement the ACA in California, including transitioning the "Low Income Health Program" (LIHP) to ACA coverage options, with the goal of enrolling 450,000 to 500,000 individuals by December 31, 2013. The attachment to the letter stated that the DHCS intended to "develop and partner with local LIHP[']s, the [insurance exchange (Exchange)] and stakeholders on an outreach and communication strategy for the transition of LIHP enrollees to Medicaid or the Exchange. The outreach and communication effort will include general notification from the LIHP transition to enrollees during 2013 and information on any available transition assistance through the Exchange or the counties." This document was part of an effort by the DHCS to engage stakeholders such as plaintiff to make contact with eligible individuals and enroll them. Butler-Cohen testified there was "no question in [her] mind that the direction from the [DHCS] was clear in the utilization of [plaintiff's] outreach workers, because [they] were the boots on the ground." In Butler-Cohen's opinion, plaintiff could reach eligible individuals "far better" than the DHCS or even the county.[1]

c.  *Decision by administrative law judge*

In May 2018, the administrative law judge (ALJ) issued a proposed decision finding that the " 'community outreach services' " did not involve patient care and instead were efforts to attract new patients and increase patient utilization of plaintiff's services. The ALJ noted that members of plaintiff's outreach staff were "tasked to 'promote awareness of the health center's services and support entry into care' of the new patients contacted." These tasks included "attempting to make new patients 'comfortable

---

[1]  DHCS requests we take judicial notice of the (1) California Medicaid State Plan, Attachment 4.19-B (as in effect in 2013); and (2) California Medicaid State Plan Amendments 05-006, 08-003, 09-015, 11-037a. We deny the request. (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493.)

9

enough to seek care,' such as through repeated 'passes' of contact." The ALJ concluded that the evidence established that the disallowed amounts were spent for patient recruitment efforts not reimbursable with Medi-Cal funds.

In making its decision, the ALJ relied on part 413 of title 42 of the Code of Federal Regulations for the proposition that, to be reimbursable, costs must be reasonable and related to the care of beneficiaries. (42 C.F.R. § 413.9.) Per the PRM, reasonable costs include "all necessary and proper costs incurred in rendering the services," including both "direct and indirect costs of providers of services." (PRM §§ 2100, 2102.1 (rev. 454, 09-12).)

The ALJ reviewed the authorities submitted by plaintiff, but found them unconvincing. According to plaintiff, section 220.3 of the Medicare Benefit Policy Manual identified outreach as " 'non-reimbursable [but] nevertheless allowable.' " The ALJ noted that the cited section applied only to " 'preventative health services' provided 'by or under the direct supervision of a physician' and [said] nothing about outreach or patient recruitment." As such, even if plaintiff had provided such services at the specified locations, they would have been excluded from reimbursement by Medi-Cal.

The ALJ also rejected the idea that plaintiff should be reimbursed because it is required to provide outreach services in order to receive certain grants. The ALJ reasoned that the availability of these grants was not in question, nor did the grants necessarily require Medi-Cal to also reimburse plaintiff.

The ALJ further concluded that outreach activities are not reimbursable as case management under the 1994 letter to the state Medicaid director. The ALJ reasoned that the letter identified " 'Medicaid outreach' as one of the 'administrative costs necessary for the proper and efficient administration of the State plan,' it does not contemplate subcontracting this to FQHC clinics through cost basis reimbursement but merely cites to the Center for Medicare/Medicaid Services' . . . Medicaid Manual authorizing the State to spend Federal money on case management services. The Medicaid Manual in its current

form still authorizes such use of Federal Medicaid funds by the State, but does not discuss using FQHC clinics as outreach contractors or incorporating case management payments into FQHC per-visit rates."

With respect to the PRM, the ALJ rejected plaintiff's argument that outreach services were reimbursable because there was no provision that restricts it, such that general cost principles should be applied. The ALJ reasoned that outreach work is "performed specifically to bring new patients into the facilities." Although such activities are not prohibited, costs for patient recruitment are excluded under section 2136.2 of the PRM.

Given his conclusions, the ALJ declined to reach the DHCS's argument that the outreach costs were nonallowable due to insufficient documentation.

### d. *Motion for reconsideration and petition for writ of mandate*

Plaintiff filed a petition for reconsideration. In July 2018, the Chief ALJ affirmed the ALJ's decision, finding that the outreach costs were really patient recruitment costs and therefore nonreimbursable.

In August 2018, plaintiff filed a petition for writ of mandate in the trial court. The trial court denied the petition in April 2019. Noting that outreach costs are not discussed in the PRM, the trial court agreed with the ALJ and the Chief ALJ and found that plaintiff's outreach services are similar to advertising intended to increase patient use of plaintiff's services. Given that the cost of advertising to increase utilization of the provider's facilities is not allowable under the PRM, the trial court held that the costs were not reimbursable.

### DISCUSSION

### 1. *Standard of review*

Pursuant to Code of Civil Procedure section 1094.5, the trial court may review a Chief ALJ's final decision. (Welf. & Inst. Code, § 14171, subd. (j).) "When reviewing the denial of a petition for writ of administrative mandate under Code of Civil Procedure

11

section 1094.5, we ask whether the public agency committed a prejudicial abuse of discretion. 'Abuse of discretion is established if the [public agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' [Citations.]" (*County of Kern v. State Dept. of Health Care Services* (2009) 180 Cal.App.4th 1504, 1510.)

Like the trial court, an appellate court's task is to "determine whether the [DHCS's] decision is supported by substantial evidence. [Citation.] [¶] 'As to questions of law, appellate courts perform essentially the same function as trial courts in an administrative mandate proceeding, and the trial court's conclusions of law are reviewed de novo.' " (*Hi-Desert Medical Center v. Douglas* (2015) 239 Cal.App.4th 717, 730.) With respect to questions of law, we apply the same rules governing interpretation of statutes to the interpretation of administrative regulations, with the fundamental goal of ascertaining the agency's intent and effectuating the purpose of the law. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 994-995.) We seek to "give the regulatory language its plain, commonsense meaning . . . , and we must read regulations as a whole so that all of the parts are given effect." (*County of Kern v. State Dept. of Health Care Services, supra*, 180 Cal.App.4th at p. 1512.) As this court recently explained, although state agencies such as the DHCS "may be entitled to deference in interpreting its *own* regulations and policies" (*Oak Valley Hospital District v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 224), we do not extend such deference when it comes to the DHCS's interpretation of regulations and policies such as the PRM that are issued by federal agencies like the Centers for Medicare and Medicaid Services. (*Id*. at pp. 224-225.)

2.    *Plaintiff's claims on appeal*

Plaintiff contends the trial court erred in concluding that outreach costs are not allowable under part 413.9 of title 42 of the Code of Federal Regulations. First, plaintiff argues that part 413.9(c)(3)'s requirement that costs must be "related to the care of

12

Medicare beneficiaries" should be interpreted under its broad, ordinary meaning. According to plaintiff, its outreach activities are related to patient care because they are "designed to inform indigent people about their healthcare options," and there is a "direct linear connection" between helping people obtain such information and providing the services.

Plaintiff also argues its outreach costs were "reasonable" (and allowable under part 413.9(a) of title 42 of the Code of Federal Regulations) because they were "necessary and proper" to the furnishing of those health care services. According to plaintiff, outreach is a crucial function in providing health care to indigent individuals. Plaintiff contends such costs should be allowable, given the broad scope of costs that are allowable under the regulations.

Finally, plaintiff argues the trial court erred in concluding that outreach was akin to advertising to the general public to increase patient utilization of its facilities and therefore unallowable per PRM section 2136.2. Plaintiff argues the PRM was created before the advent of FQHC's and was not intended to address their outreach activities. According to plaintiff, courts have defined advertising as " 'widespread promotional activities usually directed at the public at large,' " which is much different than plaintiff's targeted activity of sending trained individuals into the community to help at-risk individuals obtain health care. Plaintiff argues it is bad public policy to disallow outreach costs given its value to society and the communities plaintiff serves. We find no merit in plaintiff's arguments.

3.      *Analysis*

We agree with the ALJ, the Chief ALJ, and the trial court that the DHCS did not abuse its discretion in finding that plaintiff's outreach costs were nonreimbursable. Plaintiff's outreach efforts involve going into public spaces such as on the street, at schools, business venues, beaches, and parks to attract new patients, provide counseling regarding eligibility for services, and make medical appointments for services. Such

13

services may benefit the recipient by increasing awareness of care available through plaintiff and making the recipient feel more comfortable seeking care. And, such activities are required as part of plaintiff's role as a FQHC grant recipient. (42 U.S.C. §§ 254b(b)(1)(A)(iii)-(v), 1395x(aa)(4).) However, requiring plaintiff to perform such services as an FQHC grant recipient does not automatically make the associated costs reimbursable under Medicare (or Medi-Cal), even if they provide a benefit for the recipient.

The regulations exclude costs that the program defines as not allowable, and the PRM makes clear that advertising costs "seek[ing] to increase patient utilization of the provider's facilities are not allowable." (PRM § 2136.2 (rev. 267, 09-82); 42 C.F.R. § 413.9(c)(3) (2021).) The evidence showed that plaintiff performed its outreach activities to "get the word out" about its various services and "develop[ ] awareness of each clinic's presence, resources, cultural competence, and desire to serve among members of [plaintiff's] target populations." It was not an abuse of discretion to find that such activities had the purpose and effect of bringing in new patients and increasing utilization of plaintiff's facilities, making them akin to advertising.

We disagree with plaintiff that we must disregard the PRM's clear guidance about advertising costs merely because the manual was drafted before the current FQHC program was implemented. Had the relevant agencies wished to change the manual to make FQHC outreach costs reimbursable, they would have done so. (See *City of Long Beach v. Workers' Comp. Appeals Bd.* (2005) 126 Cal.App.4th 298, 311 ["[i]f the language of the statute is unambiguous, we presume the Legislature meant what it said"].)

14

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to defendant. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                               KRAUSE        , J.


We concur:


      ROBIE           , Acting P. J.


      HOCH            , J.

Filed 7/30/21

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FAMILY HEALTH CENTERS OF SAN DIEGO | C089555 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2018-80002953-CU-WM-GDS) |
| v. | |
| STATE DEPARTMENT OF HEALTH CARE SERVICES, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | |

APPEAL from a judgment denying a petition for writ of mandate of the Superior Court of Sacramento County, Steven M. Gevercer, Judge. Affirmed.

Douglas Cumming Medical Law, Douglas S. Cumming; Murphy, Campbell, Alliston & Quinn and George E. Murphy for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Cheryl L. Feiner, Assistant Attorney General, Niromi W. Pfeiffer, Gregory D. Brown, Marianne A. Pansa, and Kevin L. Quade, Deputy Attorneys General, for Defendant and Respondent.

1

THE COURT:

The opinion in the above-entitled matter filed on July 6, 2021, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

BY THE COURT:

_____ROBIE_____, Acting P. J.

_____HOCH_____, J.

_____KRAUSE_____, J.