Filed 3/21/23  Vernoy v. Department of Motor Vehicles CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MADISON ANNE VERNOY, | D080909 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CVRI2100843) |
| DEPARTMENT OF MOTOR VEHICLES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Riverside, Harold W. Hopp, Judge.  Affirmed.

Law Office of A.P. Zmurkiewicz and A.P. Zmurkiewicz for Plaintiff and Appellant.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper and Paul Batcher, Deputy Attorneys General, for Defendants and Respondents.

# I

## INTRODUCTION

Madison Anne Vernoy appeals from the denial of her petition for review of a Department of Motor Vehicles (DMV) order suspending her driving privileges after she was arrested for driving while under the influence of alcohol (DUI). She argues the DMV failed to prove one of the facts necessary to sustain the suspension of her driving privileges—namely, the fact she was driving a motor vehicle while she had a blood alcohol concentration (BAC) of 0.08 percent or more. We reject this contention and affirm the judgment.

# II

## BACKGROUND

A. *Factual Background*

One evening, California Highway Patrol (CHP) officers received a report of a solo vehicle collision on the Interstate 8 freeway in San Diego. Upon arrival at the scene of the accident, the officers found Vernoy's vehicle resting against the side of a ditch next to the freeway. They also smelled an odor of alcohol emanating from the vehicle. Paramedics were treating Vernoy, who was unconscious and seated in the driver's seat. Vernoy was transported by ambulance to a nearby hospital, where she was sedated and intubated.

A motorist who witnessed the accident reported that Vernoy's vehicle was weaving in and out of traffic lanes on the freeway. According to the motorist, Vernoy's vehicle tried to exit the freeway, but veered into the ditch instead. The motorist stopped at the scene of the accident and found Vernoy unconscious in the driver's seat. Like the CHP officers, the motorist smelled an odor of alcohol emanating from Vernoy's vehicle.

At the hospital, a CHP officer placed the still-unconscious Vernoy under arrest for DUI in violation of Vehicle Code section 23152.[1] The officer issued Vernoy a DMV form titled, "Age 21 and Older Administrative Per Se Suspension/Revocation Order and Temporary Driver License," which stated Vernoy's driving privileges would be suspended, effective in 30 days, unless she requested a hearing to challenge the proposed suspension.

The arresting officer obtained a non-consensual blood draw warrant. Thereafter, certified phlebotomist technician (CPT) Tamara Daugherty drew two vials of blood from Vernoy's hand. The blood samples were transmitted to the sheriff's department crime laboratory, which analyzed the samples and determined Vernoy had a BAC of 0.167 ± 009—more than twice the legal driving limit—at the time of the blood draw, which took place about two and a half hours after the accident.

B. *Administrative Per Se Hearing*

Vernoy timely requested an administrative per se (APS) hearing for the purpose of challenging the proposed suspension of her driving privileges. At an APS hearing, the DMV bears the burden of proving, among other things, the fact that the licensee in question operated a vehicle when he or she had a BAC of 0.08 percent or higher. (*Lake v. Reed* (1997) 16 Cal.4th 448, 455.) One way the DMV can prove its prima facie case is by relying on Evidence Code section 664, which states, "It is presumed that official duty has been regularly performed." In the context of an APS hearing, this statute creates a rebuttable presumption that blood alcohol tests recorded on official forms were obtained by complying with the requirements of section 23158 and California Code of Regulations, title 17, section 1215 et seq. (hereafter,

---

[1] Subsequent undesignated statutory references are to the Vehicle Code.

title 17), including certain standards giving rise to an inference the recorded blood alcohol test results are reliable.

At Vernoy's APS hearing, the DMV sought to admit several documents into evidence: (1) a sworn officer's statement (DMV form DS-367), which included the officer's narrative of the incident and a traffic collision report (CHP form 555); (2) a laboratory service report from the sheriff's department crime laboratory, which showed the results of Vernoy's blood alcohol test; (3) a DUI arrest-investigation report (CHP form 202), which included the officer's preliminary synopsis of the incident and the time and location of the blood draw; (4) a CHP incident detail report; and (5) a printout of Vernoy's driving record. The hearing officer admitted these documents into evidence over hearsay, authentication, and foundation objections.

Vernoy sought to admit into evidence documents produced by Specimen Specialists of America, Inc. (SSI), which dispatched CPT Daugherty to conduct Vernoy's blood draw for the CHP. These documents included: (1) a declaration from SSI's custodian of records; (2) a call slip signed by Daugherty stating the time, place, and purpose of the blood draw she performed on Vernoy; (3) an independent contractor agreement between SSI and Daugherty; (4) documentation showing Daugherty was a state-licensed phlebotomist; and (5) an SSI policy manual dictating the procedures that SSI-contracted phlebotomists must follow when responding to a request for collection of a blood sample.[2] The hearing officer admitted these documents

---

[2] The laboratory service report included an attestation from three members of the sheriff's department crime laboratory stating the attestors were qualified to engage in forensic alcohol analysis pursuant to title 17, and the instrumentation used to perform the blood alcohol analysis was in proper working order at the time the analysis was performed.

4

into evidence over hearsay, authentication, foundation, and relevance objections.

The DMV called one witness to testify at the APS hearing—the motorist who witnessed the accident. The motorist testified he saw Vernoy driving erratically on the freeway, speeding up and slowing down, and crossing multiple lanes of traffic without signaling before she ultimately drove into the ditch. He stated he stopped at the accident site, observed Vernoy unconscious inside the vehicle, and smelled "a lot" of alcohol coming from the vehicle.

Vernoy also called one witness to testify—Sophia Martinez, SSI's Director of Operations and CPT Daugherty's supervisor. Vernoy called Martinez for the purpose of establishing that SSI violated regulatory requirements relating to the collection and handling of blood samples.[3] Under questioning from Vernoy, Martinez testified that no supervisor reviewed Daugherty's competency before she was sent to perform unsupervised blood draws; no supervisor reviewed Daugherty's work each month to ensure compliance with venipuncture policies, procedures, and regulations; and no supervisor reviewed Daugherty's competency on an annual basis. Martinez stated she was not a physician or other licensed professional specified in section 23158, and she was not present for Vernoy's blood draw, though she was accessible to Daugherty by phone to assist or consult if necessary. Further, Martinez testified that, to her knowledge, no licensed physician or surgeon approved the SSI policy manual that was admitted into evidence.

---

[3]    For ease of reference, we refer to any applicable statutory requirements and title 17 requirements collectively as regulatory requirements, and we refer to violations of those regulatory requirements as regulatory violations.

5

For purposes of this case, it is uncontested these SSI practices ran afoul of the following regulatory requirements: (1) a licensed supervisor must review the competency of a phlebotomist before the phlebotomist may perform blood draws without direct supervision; (2) a licensed supervisor must review the work of the phlebotomist at least once a month to ensure compliance with venipuncture policies, procedures, and regulations; (3) a licensed supervisor must annually review the competency of the phlebotomist; (4) the phlebotomist must follow physician- or surgeon-approved procedures when drawing blood; and (5) a licensed supervisor, or other qualified individual, must be accessible to the phlebotomist for onsite, telephone, or electronic consultation within 30 minutes when needed. (§ 23158, subds. (e) & (g); Cal. Code Regs., tit. 17, § 1219.1, subd. (a).)

During closing arguments, Vernoy did not dispute that the DMV proved its prima facie case by introducing the sworn officer's statement and the laboratory service report, and then invoking the evidentiary presumption. However, she claimed her evidence established the regulatory violations just discussed, which in turn rebutted the evidentiary presumption and shifted the burden of proof back to the DMV. According to Vernoy, the DMV failed to satisfy its burden of proof because it did not lay an independent foundation for the admission of the laboratory service report, which was an essential piece of evidence necessary to prove she drove a vehicle while she had a BAC of 0.08 percent or higher.

A few weeks after the APS hearing, the hearing officer issued a decision upholding the suspension of Vernoy's driving privileges. Of relevance here, the hearing officer expressly found Vernoy submitted to a chemical test of her blood, which showed she had a BAC of 0.16%. The hearing officer rejected Vernoy's claim that the DMV failed to lay a proper

6

foundation for the admission of the blood alcohol test results, reasoning that any regulatory violations went "to the weight of the evidence and not the admissibility of the evidence." The hearing officer added that there was "no evidence that the violations compromised the blood test results" in any way.

C. *Superior Court Proceedings*

Vernoy filed a timely petition for review of the hearing officer's decision, which was treated as a petition for writ of administrative mandamus. (§ 13559, subd. (a); Code Civ. Proc., § 1094.5.) The petition reiterated Vernoy's assertion that the evidence adduced at the APS hearing proved regulatory violations, which rebutted the evidentiary presumption on which the DMV sought to rely. The petition requested a judgment setting aside the hearing officer's decision, an order directing the DMV to return or reissue Vernoy's driver's license, and an award of damages.

After a hearing, the trial court denied Vernoy's petition for review. The court found the DMV made a prima facie showing by presenting the sworn officer's statements and the blood alcohol test results recorded on official forms, thus giving rise to the evidentiary presumption. Then, relying on *Gerwig v. Gordon* (2021) 61 Cal.App.5th 59 (*Gerwig*), the court found Vernoy did not rebut the evidentiary presumption. The court reasoned Vernoy did not rebut the evidentiary presumption because any regulatory violations did not give rise to a reasonable inference that Vernoy's blood alcohol test results were unreliable. Further, the court noted that Vernoy did not present any evidence "call[ing] the efficacy of the test into question," or showing "the blood test results were in any way questionable."

DISCUSSION

On appeal, Vernoy reiterates her claim that the DMV could not rely on the evidentiary presumption to justify its suspension of her driving privileges because the evidence adduced at the APS hearing proved regulatory violations, which rebutted the evidentiary presumption.

To assess this argument, we begin by providing an overview of the procedures governing the suspension of a licensee's driving privileges. Then, we discuss our court's recent decision in *Gerwig, supra*, 61 Cal.App.5th 59, which directly addressed the showing a licensee must make in order to rebut the evidentiary presumption. Finally, we consider whether Vernoy made the requisite showing to rebut the evidentiary presumption.

A. *Statutory Overview*

"The DMV has authority to suspend the license of a motorist over the age of 21 who drives with a blood alcohol percentage of 0.08 or more under a statutory scheme commonly known as the ' "administrative per se" ' law." (*Gerwig, supra*, 61 Cal.App.5th at p. 65; see § 13353.2, subd. (a)(1).) "The purpose of the statute is to promote highway safety by quickly suspending the license of persons driving under the influence, while also providing prompt administrative review to anyone whose license is suspended." (*Evans v. Gordon* (2019) 41 Cal.App.5th 1094, 1101 (*Evans*).)

"When a driver is arrested for driving under the influence and is determined to have a prohibited blood-alcohol content … the arresting officer or the DMV serves the driver with a 'notice of [an] order of suspension or revocation' of his or her driver's license, advising that the suspension will become effective 30 days from the date of service." (*Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1536–1537.) After service of the notice, the driver may

request an administrative hearing, known as an APS hearing, which takes place prior to the effective date of the proposed suspension or revocation. (§§ 13353.2, subd. (c), 13558, subd. (a).) At the APS hearing, a hearing officer "determine[s] whether the arresting officer had reasonable cause to believe the person was driving, the driver was arrested, and the person was driving with a BAC of 0.08 percent or higher." (*Brown*, at p. 1537; see §§ 13557, subd. (b)(3), 13558, subd. (c)(2).) "If the hearing officer determines that the evidence establishes these three facts by a preponderance of the evidence, the license will be suspended." (*Brown*, at pp. 1537–1538.)

As noted, the DMV bears the initial burden of proving the driver was driving while he or she had a BAC of 0.08 percent or higher. (*Delgado v. Dept. of Motor Vehicles* (2020) 50 Cal.App.5th 572, 577 (*Delgado*).) But the DMV "can usually prove up a prima facie case with relative ease when a blood sample was taken from the licensee by submitting two documents: 'the sworn statement of the arresting officer and a forensic lab report documenting the results of a chemical test of the driver's blood.' [Citations.] This expedited process, which circumvents the authentication, foundation, and hearsay concerns that often accompany evidentiary submissions, is possible because the DMV routinely invokes Evidence Code section 664, which ' "creates a rebuttable presumption that blood-alcohol test results recorded on official forms were obtained by following the regulations and guidelines of title 17," including regulations giving rise to an inference the blood alcohol test results are reliable. (*Gerwig, supra*, 61 Cal.App.5th at pp. 65–66.) Thus, as a technical matter, the officer's statement and blood alcohol test results establish a rebuttable presumption relating to the performance of an official duty. However, as a practical matter, they create a rebuttable presumption that the blood alcohol test results "are valid, reliable,

and admissible." (*Evans, supra*, 41 Cal.App.5th at p. 1103; accord *Davenport v. Dept. of Motor Vehicles* (1992) 6 Cal.App.4th 133, 144 (*Davenport*) [the presumption of compliance with regulations "gives rise to an inference of reliability."].) "Once the DMV meets [its] initial burden to establish a prima facie case, the driver may rebut the presumption with 'affirmative evidence of the nonexistence of the presumed facts sufficient to shift the burden of proof back to the DMV.' " (*Delgado,* at p. 755; see Evid. Code, § 604.)

If the APS hearing results in the suspension or revocation of a person's driving privileges, the person may seek judicial review of the decision in the superior court. (§ 13559, subd. (a).) The judicial proceeding is limited to the administrative record from the APS hearing and additional evidence may not be introduced. (*Ibid*.) "The trial court exercises its independent judgment to determine whether the administrative decision was supported by the weight of the evidence." (*Delgado, supra*, 50 Cal.App.5th at p. 577.)

In an appeal challenging the trial court's conclusions as to the weight of the evidence, an appellate court " ' "need only review the record to determine whether the trial court's findings are supported by substantial evidence." ' " (*Gerwig, supra*, 61 Cal.App.5th at p. 66.) "To the extent the question is one of statutory or regulatory interpretation, we exercise our independent judgment." (*Delgado, supra*, 50 Cal.App.5th at p. 577.)

B. *The Gerwig Decision*

Recently, in *Gerwig, supra*, 61 Cal.App.5th 59, this court considered the type of showing a licensee must make during an APS hearing in order to rebut the evidentiary presumption. We undertook this inquiry when presented with facts virtually identical to the facts of the present case.

In *Gerwig*, a motorist involved in a traffic accident was placed under arrest on suspicion of DUI. (*Gerwig, supra*, 61 Cal.App.5th at p. 63.) He

submitted to a blood draw conducted by a state-certified, SSI-contracted phlebotomist, and testing performed on the blood samples showed he had a BAC exceeding 0.08 percent. (*Ibid.*) The motorist requested an APS hearing to challenge the consequent proposed suspension of his driving privileges. (*Ibid.*) At the APS hearing, the arresting officer's report and the laboratory report reflecting the blood alcohol test results were admitted into evidence, thus allowing the DMV to invoke the evidentiary presumption. (*Ibid.*)

Like Vernoy, the motorist called an SSI employee to testify at the APS hearing. (*Gerwig, supra*, 61 Cal.App.5th at p. 63.) The employee provided testimony proving all but one of the regulatory violations implicated in the present case. Specifically, he testified the phlebotomist did not operate under physician- or surgeon-approved policies and procedures; a licensed supervisor did not review the phlebotomist's work or competency on a monthly or annual basis; and a licensed supervisor or other qualified individual was not available to consult the phlebotomist within 30 minutes. (*Ibid.*) The hearing officer found there were regulatory violations, but nonetheless relied on the blood alcohol test results to sustain the suspension. (*Id.* at p. 64.) In doing so, she found there was no reason to doubt the accuracy of the test results or the qualifications of the phlebotomist who drew the motorist's blood.

On appeal, our court was called to decide whether a licensee may rebut the evidentiary presumption by establishing *any* violation of a regulation governing blood collection or testing, or whether a licensee may only rebut the presumption by proving a regulatory violation generating doubt about the

integrity of the test result.[4] (*Gerwig, supra*, 61 Cal.App.5th at p. 65.) After conducting an extensive review of the caselaw, we concluded a licensee may rebut the evidentiary presumption only if the violation bears a relationship to the reliability of the test result. (*Id.* at pp. 66–71.) Indeed, we observed that in each case in which an appellate court has found the evidentiary presumption rebutted, it has done so only when the licensee established one or more regulatory violations casting "doubt [on] the reliability of the test." (*Id.* at pp. 70–71.) Further, we noted that the "caselaw [was] … scattered with comments that emphasize[d] substantive reliability in analyzing the import of regulatory violations." (*Id.* at p. 71, fn. 7 [collecting cases].)

As part of our caselaw analysis, we examined one decision especially closely—*Davenport, supra*, 6 Cal.App.4th 133. The motorist in *Gerwig* relied heavily on a passage from *Davenport* to support his assertion that a licensee may rebut the evidentiary presumption by proving *any* regulatory violation,

---

[4]     As we explained in *Gerwig*, not "every requirement in title 17 relates directly to the reliability of a chemical blood test. The regulations span a broad range, and some provisions—such as those mandating that the blood draw site and the outside of the collection vial never be cleaned with alcoholic swabs—are patently connected to the test's reliability. [Citation.] Others are not. For example, part of the Vehicle Code incorporated into title 17 requires phlebotomists to always carry an identification card (ID). [Citation.] If a certified technician left her ID at home inadvertently while answering a midnight call, that violation cannot be seriously contended to have affected the blood draw. Another section on proper training for those who administer breath tests mandates that successful students receive a certificate with their name, ID or badge number, their agency, and their instructor. [Citation.] If a clerical error resulted in the certificate misreporting some of this information for an otherwise properly trained operator, we cannot imagine how that would bear on the reliability of the tests the operator conducts." (*Gerwig, supra*, 61 Cal.App.5th at p. 68, fn. 5.) Vernoy does not dispute our conclusion that some title 17 requirements relate directly to the reliability of blood alcohol tests, while others do not.

no matter how loosely related the regulatory violation may be to the reliability of the blood alcohol test result. (*Gerwig, supra,* 61 Cal.App.5th at pp. 66–70.) In the passage at issue, the *Davenport* court stated, "If the licensee shows, through cross-examination of the officer or by the introduction of affirmative evidence, that official standards were *in any respect* not observed, the burden shifts to the [DMV] to prove that the test was reliable despite the violation." (*Davenport,* at p. 144, italics added.)

We determined the "official standards" passage from *Davenport* did not support the motorist's argument for several reasons. (*Gerwig, supra,* 61 Cal.App.5th at pp. 66–70.) Preliminarily, "the question before the court in *Davenport* was *not* the threshold showing required to rebut the Evidence Code presumption" and, therefore, the "official standards" language was "explanatory dicta." (*Gerwig,* at p. 67.) Further, immediately prior to the "official standards" language, the *Davenport* court characterized the evidentiary presumption in the following terms: "[W]hat is actually presumed under Evidence Code [section] 664 is *compliance with statutory and regulatory standards*, which in turn gives rise to an inference of reliability." (*Davenport, supra,* 6 Cal.App.4th at p. 144.) "Given that the [*Davenport*] court had in mind this 'inference of reliability,' " we found it highly "unlikely that in its very next pen strokes it meant to do away with any nexus between reliability and how the presumption can be rebutted." (*Gerwig,* at p. 67.) Finally, we analyzed the caselaw cited by the *Davenport* court to support the "official standards" language, and we found it too "emphasi[zed] … the nexus between the regulatory violation and the test's reliability." (*Gerwig,* at p. 70.)

Having concluded a licensee may rebut the evidentiary presumption only by proving a regulatory violation bearing a reasonable relation to the

13

reliability of the blood alcohol test results, we turned to whether the violations in *Gerwig* rebutted the presumption. We found they did not rebut the presumption. The supervisory and approved procedure violations were "too tenuous to cast doubt on the reliability of the blood test results." (*Gerwig, supra*, 61 Cal.App.5th at p. 69.) Notwithstanding the violations, the state-certified phlebotomist who performed the blood draws was still "a person who presumably conduct[ed] blood draws, which he [was] trained to do, in the same way regardless of the general supervision he receive[d]. While an unsupervised phlebotomist could make a mistake, so too could a properly supervised one. There [was] nothing [t]here to suggest a mistake was made, nor [was] there any indication that the particular circumstance of [the motorist's] blood draw presented a problem the lackluster supervision structure at SSI left [the phlebotomist] ill equipped to address." (*Id.* at p. 71.) Thus, we concluded the violations " 'show[ed] no more than a mere possibility that the integrity of the sample was not maintained. Such speculation [was] insufficient to support a reasonable inference that the integrity of the sample was, in fact, compromised.' " (*Id.* at p. 72.)

C. *Vernoy Did Not Rebut the Evidentiary Presumption*

The DMV posits that *Gerwig* is "nearly identical" to the present case and, therefore, "the result should be the same" here as it was in *Gerwig*—an affirmance of the DUI suspect's driving privilege suspension. Vernoy argues *Gerwig* is not controlling because it is factually distinguishable and, in any event, it was wrongly-decided. We agree with the DMV.

As an initial matter, we reject Vernoy's attempt to distinguish *Gerwig* on the facts. As we have already stated, the facts of *Gerwig* are virtually identical to the facts of the current case. The motorist in *Gerwig* tried to rebut the evidentiary presumption by proving violations of general

14

supervision regulations and regulations governing the method by which blood draw policies are approved.  At Vernoy's APS hearing, she relied on precisely the same regulatory violations from the very same company (SSI) to try to rebut the evidentiary presumption.  It is true Vernoy relied on one additional regulatory violation that was not present in *Gerwig*—a violation of a provision mandating an ex ante review of a phlebotomist's competency before the phlebotomist may conduct an unsupervised blood draw.  (§ 23158, subd. (g); Cal. Code Regs., tit. 17, § 1219.1, subd. (a).)  However, that regulatory violation is simply another violation of a general supervision standard.  It is materially the same as the general supervisory violations that were at issue in *Gerwig* and, just like those general supervisory violations, it bears no reasonable relation to the reliability of the blood alcohol test results.

We also find no merit in Vernoy's argument that the *Gerwig* decision was wrongly-decided.  As previously stated, this court issued the *Gerwig* decision.  In fact, the jurists sitting on this panel are the same three jurists who decided *Gerwig*.  "Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of the same undivided district or from the same division."  (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9; accord *County of Kern v. State Dept. of Health Care Servs.* (2009) 180 Cal.App.4th 1504, 1510 ["we generally follow the decisions of other appellate courts unless there is good reason to disagree"].)  "Mere disagreement with the result or reasoning of an earlier decision does not … constitute a compelling reason" to overrule a prior decision of this court. (*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1204.) Vernoy has not presented us with a convincing reason, let alone a compelling one, that would convince us to overrule *Gerwig*.

Vernoy claims the *Gerwig* decision was erroneous because it flouts "established case law," namely the "official standards" language contained in the *Davenport* decision. The *Gerwig* decision did no such thing. On the contrary, it carefully examined the caselaw, including *Davenport*, and persuasively articulated how that caselaw demonstrated the need for a nexus between the regulatory violation at issue and the reliability of the blood alcohol test results. (*Gerwig, supra*, 61 Cal.App.5th at pp. 66–71.) We need not rehash *Gerwig* decision's exhaustive caselaw analysis here. For present purposes, it suffices to say we agree with *Gerwig*'s caselaw analysis, as well as its overarching conclusion that a driver may rebut the evidentiary presumption under Evidence Code section 664 only with proof of regulatory violations bearing a relation to the reliability of the blood alcohol test results. (*Id*. at p. 72.)

Next, Vernoy contends we should overrule *Gerwig* on grounds that it permits courts (and presumably litigants) to "ignore" the regulatory requirements set forth in section 23158 and title 17, effectively usurping the functions of the legislative and executive branches that promulgated the regulations. Vernoy's argument is not persuasive. The *Gerwig* decision does not alter, or any way affect, the obligations of law enforcement departments or their agents to comply with the mandatory regulatory requirements governing the collection and handling of blood samples for blood alcohol testing. Nor does it prescribe new regulatory requirements that must be followed. Instead, *Gerwig* clarifies the evidentiary consequences that result, in the context of an APS hearing, where there has been a proven violation of a regulation bearing no reasonable relationship to the reliability of a blood alcohol test result. This clarification does not impinge upon the essential functions of the legislative or executive branches.

16

Finally, Vernoy argues we should reject *Gerwig* to the extent it held that the general supervisory and approved procedure violations established in that case were not reasonably related to the reliability of blood alcohol test results. According to Vernoy, those regulations "matter," i.e., they relate to the reliability of blood alcohol test results, because "supervision makes it more likely that blood draws performed … for forensic alcohol analysis purposes will be performed properly, again and again." Stated differently, Vernoy claims the particular regulations at issue in *Gerwig* (and in the current case) make it more likely the blood test results are both accurate and precise.

We considered—and rejected—a version of this argument in *Gerwig*. As we explained, there is an "indirect" nexus between general supervision and approved procedures, on the one hand, and the reliability of blood alcohol test results, on the other hand, "just as one could say that good nutrition and adequate rest are important to a phlebotomist's job performance. But such factors, without more, are too tenuous to cast doubt on the reliability of the blood test results." (*Gerwig, supra*, 61 Cal.App.5th at pp. 68–69; *id.* at p. 62 [the regulatory violations at issue had "only an indirect and speculative relationship to the manner in which the blood test was conducted, and thus

the reliability of the test results"].) Vernoy provides no compelling argument, or evidentiary showing, suggesting our conclusion was incorrect.[5]

For all these reasons, we conclude *Gerwig* is controlling. As in *Gerwig*, there was no nexus between the regulatory violations established at the APS hearing and the reliability of the blood alcohol test results. The blood alcohol test results were recorded on official forms and showed Vernoy had a BAC roughly double the legal driving limit at the time of her blood draw. Further, as the hearing officer and the trial court both noted, Vernoy presented no evidence casting doubt on the reliability of the blood alcohol test results. On this record, Vernoy failed to elicit sufficient evidence to rebut the evidentiary presumption on which the DMV relied. Because Vernoy did not rebut the evidentiary presumption, the DMV satisfied its burden of proving that Vernoy operated a vehicle while she had a BAC of 0.08 percent or higher.

---

[5] Vernoy claims *Gerwig* was flawed because it focused exclusively on whether a nexus exists between a regulatory violation and the *accuracy* of a blood alcohol test, without considering the nexus between the regulatory violation and the predictability (i.e., reliability) of the test. We disagree. *Gerwig* broadly considered the nexus between a regulatory violation and the overall *reliability* of a blood alcohol test, whether that reliability is measured in terms of accuracy, predictability, or both. (See, e.g., *Gerwig, supra*, 61 Cal.App.5th at p. 66 [the question presented was whether the evidentiary presumption could be rebutted by a regulatory violation "that does not bear directly on the *reliability* of a test result"], italics added; *id.* at p. 70 [caselaw on the evidentiary presumption is "concerned with whether the licensee demonstrated there was a reason to doubt the *reliability* of the test"], italics added; *id.* at p. 72 ["The licensee must present some evidence that the demonstrated violation gives rise to a reasonable inference that the test results are *unreliable.*"], italics added.)

IV

DISPOSITION

The judgment is affirmed.  Vernoy will bear costs on appeal.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

DATO, J.